1  Arthur Grebow, Esq. (SBN 41374)
   Julie H. Rubin, Esq. (SBN 149423)
2  GREBOW & RUBIN, LLP
   16133 Ventura Boulevard, Suite 260
3  Encino, California 91436
   Tel: (818) 783-1100
4  Fax: (818) 783-1103
   Emails: agrebow@grebowrubinlaw.com
5            jrubin@grebowrubinlaw.com

6  Attorneys for Plaintiffs James A. Badame and Diane M. Badame

7

8                UNITED STATES DISTRICT COURT

9       CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

10

11 JAMES A. BADAME and DIANE        )  CASE NO. 2:13-cv-05425 PA (FFMx)
   M. BADAME,                       )
12                                  )  MEMORANDUM OF POINTS AND
                  Plaintiffs,       )  AUTHORITIES IN OPPOSITION TO
13                                  )  DEFENDANT'S MOTION FOR
   vs.                              )  SUMMARY JUDGMENT
14                                  )
   JP MORGAN CHASE BANK,            )  DATE:    February 10, 2014
15 NATIONAL ASSOCIATION, A          )  TIME:    1:30 p.m.
   SUCCESSOR TO WASHINGTON          )  COURTROOM:   15
16 NATIONAL BANK, and DOES 1        )  JUDGE: Hon. Percy Anderson
   to 100, Inclusive,               )
17                                  )
                  Defendants.       )  Date Action Filed: August 1, 2012
18 _____  )  Discovery Cutoff: February 3, 2014
                                       Motion Cutoff:    February 10, 2014
19                                     Trial Date:       April 15, 2014

20

21

22

23

24

25

26

27

28

57279 20140124 Badame-Oppo-Ps&As-1.docx

# TABLE OF CONTENTS

**Page**

1. SUMMARY OF OPPOSITION ................................................................................ 1

2. STATEMENT OF FACTS ...................................................................................... 2

    A.    The Badames Attempt to Modify The Terms of Their Loan ........................ 3

    B.    Chase Delays Its Review of Modification ...................................................... 5

    C.    Chase Improperly Rejects The Modification ................................................. 5

    D.    Chase Agrees to Postponement of Foreclosure Sale ..................................... 6

    E.    Chase Breaches Postponement Agreement ...................................................... 7

    F.    Chase Agreed to Suspend the Foreclosure Status ......................................... 8

3. LEGAL ISSUES ..................................................................................................... 9

    A.    Chase's Challenge to The Second Claim For Breach of Contract is
           Legally Incorrect and Argues Triable Issues of Material Fact ...................... 9

           (1)    The Alleged Condition Precedent Requiring Payment by
                    August 24 Was Waived ................................................................. 10

           (2)    The August 24, 2010 Payment Date Was Modified by An Oral
                    Waiver And Is Not Barred By The Parol Evidence Rule ................ 10

           (3)    Chase's Refusal to Accept Payment on August 25 Constitutes
                    an Anticipatory Repudiation ......................................................... 11

           (4)    The September 1, 2010 Loan Modification Was an
                    Enforceable Agreement ................................................................. 12

           (5)    Chase's Breach of The Contract Has Caused The Badames
                    Damage ......................................................................................... 13

    B.    The Sixth and Seventh Claim For Negligence And Negligent
           Misrepresentation Involves Triable Issues of Material Fact as to The
           Existence of a Duty of Care ............................................................................ 14

    C.    The Sixth Claim Satisfies The Requirements For Negligent
           Misrepresentation ............................................................................................ 15

           (1)    Negligent Misrepresentation Is An Appropriate Claim ................. 15

           (2)    *Federal Rule* 9(b) Does Not Apply to The Negligent
                    Misrepresentation Claim.  However, Even if it Did, Plaintiffs'
                    Complied With The Rule. ............................................................... 18

    D.    There Is a Triable Issue of Fact Concerning The Resulting Tort
           Damages ............................................................................................................ 18

E.      The Economic Loss Doctrine Does Not Bar The Badames' Tort Claims ........................................................................................ 21

F.      Plaintiffs' Fraud Claim is Not Barred by The Economic Loss Doctrine ...................................................................................... 22

G.      Plaintiffs' Wrongful Foreclosure Claim is Not Barred by The Economic Loss Rule ......................................................................... 22

H.      The Fifth Claim Properly States a Claim For Fraud ..................................... 22

4.   CHASE CONCEDES THAT THE PROMISSORY ESTOPPEL CLAIM IS NOT NEEDED BECAUSE THE PROMISE WAS SUPPORTED BY CONSIDERATION ........................................................................................ 23

5.   UNFAIR BUSINESS PRACTICES PURSUANT TO *BUSINESS AND PROFESSIONS CODE* §17200 ........................................................................ 23

A.      *Business and Professions Code* Violations ................................................. 23

B.      Unfair Business Practice .................................................................................. 24

C.      Members of The Public Are Likely to be Deceived .................................... 24

D.      Damages .............................................................................................................. 24

6.   CONCLUSION ...................................................................................................... 25

## TABLE OF AUTHORITIES

**Page**

**Cases**

*Alexander v. Code Masters Group, Ltd.* (2002) 104 Cal.App.4th 129 ............................... 12

*Appolo Capital Fund, LLC v. Roth Capital Partners, LLC* (2007) 158 Cal.App.4th 226 .................................................................................................................................. 22

*Aspiras v. Wells Fargo Bank, N.A.* (2013) 210 Cal.App.4th 949 ....................................... 16

*Biakanja v. Irving* (1968) 49 Cal.2d 647 .......................................................................... 14

*Blanco Wine Co. v. Frank A. Logoluso Farms* (1989) 214 Cal.App.3d 699 ..................... 25

*Brandon & Tibbs v. George Kevorkian Accountancy Corp.* (1990) 226 Cal.App.3d 442 .................................................................................................................................. 13

*Burnett & Doty Development Co. v. Philips* (1978) 84 Cal.App.3d 384 .......................... 13

*Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199 ................................................... 13

*Chancellor v. One West Bank* (N.D. Cal. 2012) 212 U.S. Dist.Lexis 71992 .................... 15

*Christensen v. Slawter* (1959) 173 Cal.App.2d 325 ........................................................ 13

*County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292 ................. 21

*DRG/Beverly Hills, Ltd. V. Chopstix Dim Sum and Takeout* (1994) 30 Cal.App.4th 54 .................................................................................................................................... 10

*Erlich v. Menezes* (1999) 71 Cal.4th 543 ........................................................................ 21

*Estate of Anderson* (1983) 149 Cal.App.3d 336 ............................................................. 20

*Flint W. Murfitt v. Bank of America* (CD Cal. 2013) 213 U.S. Dist. Lexis 163345 .......... 24

*Garcia v. Ocwen Loan Servicing, LLC* (N.D. Cal. 2010) 210 US Dist. Lexis 43575 . 14, 15

*Garcia v. World Savings, FSB* (2010) 183 Cal.App.4th 1031 .......................................... 11

*Gibson v. World Savings & Loan Association* (2002) 103 Cal.App.4th 1291 .................. 24

*H.A. Bardeen v. Camando Oil Company* (1940) 40 Cal.App.3d 341 ............................... 11

*Hulen v. Stuart* (1923) 191 Cal. 562 ............................................................................... 11

*Inline, Inc. v. Apace Moving Systems, Inc.* (2005) 125 Cal.App.4th 895 ........................ 25

*Isaac Martin v. Yar Harpas* (2009 Cal.App.Unpub.Lexis 6875 ....................................... 20

*Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4th 872 ................................... 24

*Lazar v. Hertz Corp.* (1999) 69 Cal.App.4th 1494 .......................................................... 23

*Lazar v. Superior Court* (1996) 12 Cal.4th 631 .................................................................. 22

*Lewis Jorge Construction Management, Inc. v. Pomona Unified School District* (2004) 34 Cal.4th 960 ........................................................................................................... 13

*Lovejoy v. AT&T Corp.* (2004) 119 Cal.App.4th 151 .................................................... 23

*Mega Life & Health Insurance Co. v. Superior Court* (2009) 172 Cal.App.4th 1522 ....... 22

*Merced County Sheriff's Employees Association v. County of Merced* (1987) 188 Cal.App.3d 622 ........................................................................................................... 12

*Metz v. Soares* (2006) 142 Cal.App.4th 1250 .................................................................. 19

*Mobile Oil Corp. v. Handley* (1978) 76 Cal.App.3d 956 ................................................ 11

*Moss v. Miner Properties, Inc.* (1968) 262 Cal.App.2d 847 .......................................... 10

*Motas, Inc. v. Times Mirror Co.* (1980) 102 Cal.App.3d 735 ........................................ 24

*National Union Life Insurance Co. of Pittsburgh, Penn. v. Cambridge Integrated Services Group, Inc.* (2009) 171 Cal.App.4th 35 .......................................................... 16

*Nielsen v. Union Bank of California* (CD Cal. 2003) 290 F.Supp. 1001 ......................... 18

*Nymark v. Hart Federal Savings & Loan Association* (1991) 231 Cal.App.3d 1089 . 14, 15

*Oracle USA, Inc. v. EXCEL Global Services, Inc.* (N.D. Cal. 2009) 2009 U.S. Dist. Lexis 59999, p. 4 ............................................................................................................ 21

*Panno v. Russo* (1947) 82 Cal.App.2d 408 ...................................................................... 10

*Patrick D. Howard v. First Horizon Home Loan Corporation* (ND Cal. 2013) 2013 U.S.Dist.Lexis 167715 .................................................................................................... 18

*Peterson v. Allstate Indemnity Company* (2012) 281 FRD 413 ...................................... 18

*Podolsky v. First Healthcare Corp.* (1996) 50 Cal.App.4th 632 ..................................... 23

*Richard Lueras v. BAC Home Loan Servicing, LP* (2013) 221 Cal.App.4th 49 16, 17, 24, 25

*Robertson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979 ....................... 21, 22

*Rosenfeld v. JP Morgan Chase Bank, N.A.* (N.D. Cal. 2010) 732 F.Supp.2d 952 ........... 22

*Santa Barbara Pistachio v. Cowchila Water District* (2001) 88 Cal.App.4th 439 .......... 19

*Smith v. State Farm Mutual Automobile Insurance Co.* (2001) 93 Cal.App.4th 700 ........ 24

*Sosin v. Richardson* (1962) 210 Cal.App.2d 258 ............................................................. 10

*Strebel v. Brenlar investments, Inc.* (2006) 135 Cal.App.4th 740 ............................... 19, 20

*Thrifty-Telephone, Inc. v. Bezenek* (1996) 46 Cal.App.4th 1559 .................................... 22

*Tucker v. Pacific Bell Mobile Services* (2012) 208 Cal.App.4th 201 .............................. 24

*U.S. Capital Partners, LLC v. AHMSA International, Inc.* (ND Cal. 2013) 2013 U.S. Dist.Lexis 20245 ............................................................................................ 18

*U.S. Ecology, Inc. v. State of California* (2005) 129 Cal.App.4th 887 ............................. 23

*United Association Local 38 Pension Fund v. Aetna Casualty and Surety Co.* (9th Cir. 1986) 790 F.2d 1428 ...................................................................................... 10

*Vess v. Ciba-Geigy Corp. USA* (9th Cir. 2003) 317 F.3d 1097 ........................................ 18

### Statutes

*Business and Professions Code* §17200 ..................................................................... 23, 24

*Business and Professions Code* §17203 .......................................................................... 25

California Foreclosure Prevention Act, 10 CCR 2031.4, 2031.5(c)( ................................. 1

*Civil Code* §1436 .............................................................................................................. 10

*Civil Code* §1440 .............................................................................................................. 11

*Civil Code* §1698 .............................................................................................................. 10

*Civil Code* §1710(1) .......................................................................................................... 22

*Civil Code* §17204 ............................................................................................................ 24

*Civil Code* §2923.6(c) ....................................................................................................... 24

*Civil Code* §3300 .............................................................................................................. 13

*Civil Code* §3333 ........................................................................................................ 18, 19

*Federal Rule* 9(b) .............................................................................................................. 18

### Other Authorities

*California Civil Jury Instructions* (CACI) 323 ................................................................. 10

## 1.    SUMMARY OF OPPOSITION

Like the medieval alchemist who attempts to convert straw into gold, the Defendant JP Morgan Chase Bank ("Chase") is attempting to transform what is essentially a contested issue of material fact into a Motion for Summary Judgment.  It has provided the Court with a truncated and incomplete version of the underlying facts and a misstatement of applicable law.

Plaintiff James A. Badame's business suffered a severe economic setback beginning in 2008, which forced its sale in April 2009.  Shortly thereafter the property was listed for sale and Mr. Badame began a job search.  He and the Plaintiff Diane M. Badame (Dr. Badame) resorted to liquidating their personal savings and investments to service debt until October 2009 when those assets were exhausted.  Chase was advised of the situation, offered assistance in the form of reduced payments, which the Plaintiffs could not service. They initially sought a modification with the hope that Mr. Badame would soon find employment but withdrew that request when the severity of the recession became apparent and the likelihood of employment more remote.  They then opted to pursue their only remaining practical alternative at the time, a short sale. After unsuccessful attempts to gain approval of multiple short sale requests by Chase, Mr. Badame's job search was successful.  He then applied to Chase in May 2010 for a loan modification. Chase began foreclosure proceedings shortly thereafter and continued foreclosure proceedings during the modification process (commonly referred to as "dual tracking").  After the Badames paid two monthly payments at Chase's request, Chase agreed to continue the pending foreclosure sale from June 25, 2010 to August 25, 2010.

Chase delayed sending the modification request to its underwriting department to be reviewed under the NPV test[1] until August 2, 2010 partly because of administrative processes

---

[1] The NPV (Net Present Value) Test, developed by the Department of the Treasury, compares the expected cash flow from a modified loan with the expected cash flow from the same loan with no modification to determine which option is likely to be more valuable to the investor. If the NPV test estimates that modifying the mortgage will result in more revenue for the investor than not modifying the mortgage (described as a positive NPV result), the investor must, with certain limited exceptions, offer a mortgage modification to the homeowner. (California Foreclosure Prevention Act, 10 CCR 2031.4, 2031.5(c)(2)) Experts for both the Badames and Chase agree that the NPV result would be positive if Chase had included Mr. Badame's Social Security income.  The Badames' Housing Debt-to-Income ratio, Chase's primary guideline for determining the borrower's ability to repay the loan, was substantially below the maximum allowable ratio of 50%.

1   and oversights and partly because the documents became stale with the passage of time forcing

2   the Badames to submit, among other things, the same documents and confirmations multiple

3   times.   On August 13, Chase declined the modification application because it concluded that

4   there was a negative NPV.  An administrative error delayed the formal internal approval of the

5   declination decision until August 17.

6          Despite Chase's internal policy of advising borrowers of the result of their modification

7   requests within 24 hours of a decision, Chase did not inform the Badames of the declination until

8   Mr. Badame called seeking an update the morning of August 24, the day before the foreclosure

9   sale.  When Mr. Badame told Chase that the NPV was incorrectly calculated because it omitted

10  some of his income (his monthly Social Security payment) he was advised that Chase would

11  reconsider the application and continue the foreclosure sale two weeks to September 9 if the

12  Badames signed a Foreclosure Postponement Agreement (Postponement Agreement), provided a

13  listing agreement on their present residence (both of which they did on August 24) and delivered

14  a cashier's check to Chase in the amount of one month's payment on August 24, the same day

15  that he was notified of the declination.  Mr. Badame and the Chase representative agreed that Mr.

16  Badame would get a cashier's check from his bank when it opened at 9:00 a.m. on August 25,

17  would immediately thereafter express mail the check and E-mail evidence of the check had been

18  sent to Chase.

19         Despite their agreement, when Mr. Badame called the Chase representative at 8:34 a.m.

20  on August 25 to advise him he was leaving for his appointment with the bank, the representative

21  told him not to go to his bank to obtain payment since his modification request had again been

22  declined because of insufficient income and Chase was proceeding with the foreclosure sale.

23  Chase sold the property at a foreclosure auction on August 25.

24         It is undisputed that if Chase included Mr. Badame's Social Security income the NPV

25  would have been positive and Chase would have been obligated to modify the loan.  Instead,

26  Chase foreclosed and the Badames were deprived of their home and its future appreciation.

27  **2.     STATEMENT OF FACTS**

28         The Badames are husband and wife. (Separate Statement – Additional Material Fact

1  "SSAMF" No. 74) For several years, Mr. Badame was the owner of an indirect automobile

2  finance company. (SSAMF No. 75)   Dr. Badame, is a professor and was, at the time, an

3  Associate Dean at the Marshall School of Business at the University of Southern California. (*Id.*)

4       In 2003, the Badames decided to demolish the home on their residence property at 1512

5  Via Lazo, Palos Verdes Estates, California ("the property") and construct a new luxury home

6  that would serve as a long-term investment. (SSAMF No. 76) They invested almost $2,000,000

7  of their own money in the construction effort and obtained permanent financing from

8  Washington Mutual Bank (taken over by Chase) in the sum of $3,000,000. (SSAMF No. 77.)

9       Mr. Badame's automobile finance business tracked the recession of 2008 forcing its sale

10  in April 2009.  While he retained his employment, non-payment of his salary prompted his

11  resignation in August 2009. (SSAMF No. 78)

12       For over a year, the Badames made their mortgage payment to Chase, paid the property

13  tax and maintained insurance coverage on the property by supplementing their income with

14  withdrawals from their savings account and liquidating investments. (SSAMF No. 79)  However,

15  by October 2009, Mr. Badame's job search efforts had yet to bear fruit, their reserve funds were

16  exhausted and they were unable to continue monthly payments. (SSAMF No. 80)  After a

17  number of unsuccessful attempts to gain Chase's approval of short sale offers, the likelihood Mr.

18  Badame would soon become employed coupled with the recent promotion and accompanying

19  increase in compensation of Dr. Badame, they decided to apply to Chase for a loan modification.

20  (SSAMF No. 82)

21       **A.    The Badames Attempt to Modify The Terms of Their Loan**

22       Because of the dramatic increase in their monthly incomes (the combined monthly

23  income was in excess of $42,000 per month), the Badames initiated a loan modification request

24  with Chase in May 2010, and were put in touch with Sherman Slade, a junior underwriter, who

25  would process the request. (SSAMF No. 83)  The Badames set aside their pending short sale

26  request at Chase's request in order for Chase to process their new modification request.

27  (SSAMF No. 84)

28       Despite the new request for modification, on June 7, 2010, the Badames received a

1  Notice of Trustees Sale dated June 4, 2010. (SSAMF No. 85)  The Notice of Trustees Sale stated

2  that the property was scheduled to be sold at a foreclosure sale on June 25, 2010. (*Id.*) When Mr.

3  Badame contacted Mr. Slade on June 7, he was advised to disregard the notice. (*Id.*)

4      In June 2010, Chase made a request for additional documentation, some of which

5  appeared to be based on information provided in the original request for modification that was

6  submitted in October 2009 and withdrawn in November.  For example, on June 9, 2010, Chase

7  requested P&L information about businesses which the Badame's no longer owned. Mr. Badame

8  contacted Chase to clarify the request and then offered to send the applicable documents.

9  However, he was advised to hold all documentation until everything, including a job offer letter,

10  could be sent to Chase in one submission. (*Id.*)

11      On June 21, 2010 Mr. Badame informed Mr. Slade that he received the job offer letter

12  and sent Mr. Slade all of the additional documents Chase had requested on June 9, 2010

13  including the two additional months of bank account statements, both of which reflected the

14  automatic deposit of his Social Security income (SSAMF No.87).

15      On June 22, 2010, Mr. Badame contacted Mr. Slade to confirm the modification was

16  complete and to make arrangements to postpone the Trustee's sale date. (SSAMF No. 88.)  Mr.

17  Slade agreed to postpone the foreclosure sale for sixty-(60) days to August 25, 2010 and

18  requested that two monthly payments totaling $31,866 be made before June 25, 2010. (*Id.*) A

19  cashier's check in that amount was delivered to Chase via Federal Express, as requested by Mr.

20  Slade, on June 23, 2010 and the foreclosure sale was postponed to August 25, 2010. (SSAMF

21  No. 89)

22      On June 22, 2010 the Badame modification was deemed complete but not immediately

23  submitted to Chase's underwriting department for processing. (SSAMF No. 90)

24      On June 25, 2010, Mr. Badame sent an E-mail to Mr. Slade reminding him of their

25  conversation regarding the verification of Mr. Badame's Social Security income, including a

26  summary the Badames' total household income, which at that time totaled $42,122 per month.

27  (SSAMF No. 91)

28      On July 13, 2010, the Badames received a notice from Chase dated July 6, 2010, which

MEMO OF Ps&As IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1   advised that the modification request had been declined. (SSAMF No. 92) Mr. Badame contacted

2   Chase on that date and was advised to disregard the notice and to provide June paystubs and a

3   hardship affidavit (which he had provided with the original application package in May). (*Id.*)

4   Both documents were provided on July 13, 2010. (*Id.*) The same summary of amounts and

5   sources of income previously provided to Mr. Slade on June 25, 2010 was again provided. (*Id.*)

6       **B.**    **Chase Delays Its Review of Modification**

7       Even though Chase had a complete Badame modification request package from the

8   Badames in June 2010, Chase did not assign the application to its underwriting department until

9   August 2, 2010.  (SSAMF No. 93)

10       On August 9, 2010, Chase requested additional information including previously

11   produced documentation concerning the Badame income. (SSAMF No. 94)  For example, Chase

12   requested the June 2010 paystub (which had been previously provided on July 13, 2010) and July

13   2010 paystub for Dr. Badame and a confirmation of her pay schedule. (*Id.*) The Badames

14   complied with the request and reminded Mr. Slade of Dr. Badame's increase in income as well

15   as offered to provide current banking statement verifying receipt of Social Security income as

16   well as any further information. (SSAMF No. 95) Nothing further was requested. (*Id.*)

17       **C.**    **Chase Improperly Rejects The Modification**

18       Between August 9, and August 24, the Badames asked Mr. Slade several times for an

19   update concerning the status of their proposed modification, and received no response. (SSAMF

20   No. 96)

21       However, on August 13, 2010 and again on August 17, 2010, the Chase underwriter

22   rejected the proposed modification because, according to its underwriting system, the  net

23   present value (NPV) calculation produced a negative result. (SSAMF No. 97) Contrary to

24   Chase's protocol for prompt notification to the borrower, usually within 24 hours, Mr. Slade did

25   not inform the Badames of this decision until Mr. Badame again called on the morning of August

26   24. (SSAMF No. 98)

27       On August 24, 2014, Mr. Slade advised Mr. Badame that the modification request was

28   denied "because of insufficient income". (SSAMF No. 99) When Mr. Slade reviewed Chase's

income and expense calculations with Mr. Badame, Mr. Badame pointed out that Chase had neglected to include his monthly Social Security income of $2,230 and had improperly included monthly expenses such as the mortgage payment on the Marjorie property, which was to be sold. (SSAMF No. 100.) The combined effect of the income increase and expense decrease was in excess of $6,000 per month. (*Id.*)

Mr. Slade acknowledged the inputs would make a substantial difference, and asked Mr. Badame to hold on the telephone while he spoke with the underwriter. (SSAMF No. 101) He advised Mr. Badame, after he spoke with an underwriter, that the senior underwriter would review the calculations and that the outcome looked very positive. (SSAMF No. 102)

### D.   Chase Agrees to Postponement of Foreclosure Sale

Mr. Slade agreed to extend the August 25 foreclosure sale date fifteen (15) days to September 9, 2010, so that income and expense calculations could be rereviewed by the underwriters. (SSAMF No. 103)  Mr. Slade requested that the Badames execute a Postponement Agreement, which he would E-mail shortly, immediately list the Marjorie property for sale, and Express Mail one monthly payment to him. (SSAMF No. 104)

Mr. Slade prepared and sent by E-mail the Postponement Agreement that he needed "signed and returned no later than 8:00 a.m. tomorrow morning". (SSAMF No. 105) The E-mail also stated that he needed a copy of proof that funds were in route and a copy of the Listing Agreement for the Marjorie Property. (*Id.*)

Upon receipt of the E-mail, Mr. Badame spoke to Mr. Slade by telephone and discussed the 8:00 a.m. deadline for receipt of proof of transit of funds.  (SSAMF No. 106)  Mr. Slade, agreed to Mr. Badame's request, that since neither of the Badames could get to the bank on August 24, that Mr. Badame could get to the bank when it opened on August 25 at 9:00 a.m. or as close to 9:00 a.m. as possible, and purchase a cashiers check, evidence of which would be immediately E-mailed to Mr. Slade along with a copy of the air bill to confirm delivery. (SSAMF No. 107)

Mr. Badame suggested in their telephone conversation that he change the August 24 proof of funding date on the Postponement Agreement to August 25. (SSAMF No. 108) Mr.

1   Slade responded that he would prefer that the Badames did not change the document and assured

2   Mr. Badame that the date would not be an issue since he had authority to extend the time for one

3   day and would do so as long as an E-mailed copy of the cashier's check and the air bill to

4   confirm the cashier's check was sent was received on August 25, 2010. (*Id.*)

5        Mr. Slade had the authority to change the date the payment was due from August 24 to

6   August 25. (SSAMF No. 109)

7        On August 24, 2010, the Badames executed the Postponement Agreement and a Listing

8   Agreement for the sale of the Marjorie property.  (SSAMF No. 110) Those documents were sent

9   by E-mail to Mr. Slade at Chase on August 24, 2010, which also confirmed the agreement that

10  proof of funds in transit would be sent after they were purchased as close to 9:00 a.m. as

11  possible. (*Id.*)

12       **E.    Chase Breaches Postponement Agreement**

13       In the early morning of August 25, 2010, Mr. Slade sent an E-mail to the underwriting

14  department advising of the receipt of executed documentation from the Badames (the

15  Postponement Agreement and Listing Agreement), expectation of receipt of the additional funds

16  and requested re-review the NPV with new information (i.e. SSI) for an override exception.

17  (SSAMF No.111)  In order to stop the foreclosure sale all Mr. Slade would have to do is go to

18  California Reconveyance Offices, which are located in the same building.  (SSAMF No.112)

19       However, the modification request was never submitted to underwriting for review.

20  (SSAMF No. 113)  Chase proceeded with the foreclosure sale on August 25, rather than

21  postponing the sale so the NPV could be reviewed. (SSAMF No.114)

22       Mr. Badame had made arrangements to be at the Torrance Branch of Union Bank when it

23  opened at 9:00 a.m. to purchase a cashier's check for the one-month payment amount requested

24  by Chase.  (SSAMF No.115) He then intended to go to the Federal Express office across the

25  street to express mail the cashier's check and return to his home office to email a copy of the

26  cashier's check and air bill to Mr. Slade. (*Id.*)

27       Those plans, however, were thwarted when Mr. Badame called Mr. Slade at 8:34 a.m. on

28  August 25, 2010 to confirm this appointment with Union Bank to purchase the cashier's check

1   and Mr. Slade informed him that Chase was going to breach the Postponement Agreement.

2   (SSAMF No.116) He stated that the modification request was again denied because of

3   "inadequate income" (meaning that Chase did not need more time in order to process the

4   modification) and that there was not point in sending the money. (*Id.*)  Mr. Slade further

5   informed he was "working with a 9:30 a.m. deadline" in order to place the property in an auction

6   to sell at the Trustee's Sale scheduled for the same date and that there was nothing further that he

7   could do. (SSAMF No.117)

8        When the declination was communicated to Mr. Badame, Chase had not recalculated the

9   NPV based on the correct and complete set of information (SSAMF No.118)

10       Based upon the conversation with Mr. Slade and his lack of a response to Mr. Badame's

11  request to discuss making the payment that was emailed to Mr. Slade in the afternoon, Mr.

12  Badame did not obtain the funds from the bank. (SSAMF No.119)  Mr. Badame made numerous

13  efforts to speak to Mr. Slade to discuss what happened but Mr. Slade avoided responding to Mr.

14  Badame's calls and E-mail. (SSAMF No.121)

15       Chase's Real Estate Owned (REO) Division acquired the property on August 25, 2010.

16  (SSAMF No.121)

17       **F.     Chase Agreed to Suspend the Foreclosure Status**

18       Chase did not sell the property to a third party until October 12, 2010, for $2.5 million.

19  (SSAMF No.122) On September 7, 2010, the Badames received a letter from Chase dated

20  September 1, 2010, advising that the modification had been denied because the NPV was

21  negative and that the house was vacant.  (SSAMF No.123)  The Badames were further advised

22  that if Chase received a request from them within thirty days, it would provide them with the

23  date the NPV calculation was completed and the input values for the calculation. (*Id.*) If within

24  thirty days of receiving that information the Badames provided Chase with evidence that these

25  input values were incorrect and material, Chase would conduct a new NPV evaluation  (*Id.*)  The

26  September 1, 2010 letter further provided that the Badames had thirty days from the date of the

27  letter to contact Chase to discuss the reason for non-approval and that "no foreclosure sale will

28  be conducted and you will not lose your home during the thirty (30) day period." (SSAMF

**MEMO OF Ps&As IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

No.124)

Understanding that Chase's REO Department acquired the property, the Badames believed the statements in the letter to be correct and that Chase had suspended the foreclosure status. (SSAMF No.125) On September 19, 2010, the Badames responded to the September 1 letter advising of their prior submissions and requesting the NPV calculations. (SSAMF No.126)

Chase responded on September 28, 2010, to the Badames' letter but did not provide all of the information requested by them, or acknowledge the occupancy error. (SSAMF No.127)

On October 22, 2010, the Badames responded to the Chase September 28, 2010 letter. (SSAMF No.128) They again reminded that the property was their primary residence, sought NPV inputs and an acknowledgment that Chase had agreed that no foreclosure sale would be conducted and that they would not lose their home during the thirty-day period. (*Id.*) They also reminded Chase that their $42,000 month income was substantially in excess of the NPV criteria for modification of the loan and requested that Chase remove the property from the REO status. (*Id.*)

On October 30, 2010, Chase replied but did not provide the requested inputs or the acknowledgement as to status. (SSAMF No.129)  The Badames sent a follow-up letter on October 30, 2010 to which Chase did not reply. (SSAMF No.130)

## 3.   LEGAL ISSUES

If Chase had included Mr. Badame's Social Security income, its NPV calculation would have resulted in a positive result and it would have been compelled to modify the Badames' loan.

### A.   Chase's Challenge to The Second Claim For Breach of Contract is Legally Incorrect and Argues Triable Issues of Material Fact

The second claim for breach of contract is based on Chase's breach of the Postponement Agreement and the September 1, 2010 agreement entitled "Statement of Eligibility for Loan Modification".  Chase argues that the first claim fails because the Badames failed to satisfy the condition precedent requiring that they pay $15,933.27 on or before August 24, 2010 and that this makes the agreement null and void.  It further argues that the September 1, 2010 letter does not constitute an enforceable contract because the Trustee's Sale had already occurred.

Chase's contention is legally incorrect and its argument inherently contains triable issues of material fact. (*United Association Local 38 Pension Fund v. Aetna Casualty and Surety Co.* (9th Cir. 1986) 790 F.2d 1428, 1430 ["…[W]here the controversy centers not on interpretation of the contract but on whether the terms of the contract were met the case must be submitted to the trier of fact."])

### (1)   The Alleged Condition Precedent Requiring Payment by August 24 Was Waived

A condition precedent is an act that must be performed or an uncertain event that must happen before the promisor's duty of performance arises. (*Civil Code* §1436)  A condition is waived when a promisor by his words or conduct justifies the promisee in believing that a conditional promise will be performed despite the failure to perform the condition and the promise relies upon the promisor's manifestations to his substantial detriment. (*Sosin v. Richardson* (1962) 210 Cal.App.2d 258, 264)

A waiver has been repeatedly defined as "the intentional relinquishment of a known right after knowledge of the facts." (*DRG/Beverly Hills, Ltd. V. Chopstix Dim Sum and Takeout* (1994) 30 Cal.App.4th 54, 60)  A waiver of a condition is a question of fact and not of law. (*Moss v. Miner Properties, Inc.* (1968) 262 Cal.App.2d 847, 857; *California Civil Jury Instructions* (CACI) 323)

Here, the Badames have set forth facts indicating that there was a waiver of performance of condition precedent.

### (2)   The August 24, 2010 Payment Date Was Modified By An Oral Waiver And Is Not Barred By The Parol Evidence Rule

*Civil Code* §1698 contains the general provisions concerning modification of a contract in writing.  However, *Civil Code* §1698(d) expressly states:  "Nothing in this section precludes in an appropriate case the application of rules of law concerning estoppel, oral novation and substitution of a new agreement, rescission of a written contract by an oral contract, waiver of a provision of a written contract, or oral independent collateral contracts."

In *Panno v. Russo* (1947) 82 Cal.App.2d 408, 412, a case involving an oral extension of

1  the time required for the written sales-contract for payment of the price by the buyer, the Court

2  reiterated the rule that 1698 is subject to the exception that the party to the contract may be

3  estopped by his conduct or representations from denying that he orally waived the written

4  performance requirements.  (See also, *H.A. Bardeen v. Camando Oil Company* (1940) 40

5  Cal.App.3d 341, 347 [Written contract may be modified by oral agreement waiving full

6  performance of one of the provisions of the writing.])

7       Chase contends that the statute of frauds precludes enforcement of the oral waiver.  A

8  party is estopped to assert the statute of frauds as a defense "where the party, by words or

9  conduct, represents that he will stand by his oral agreement, and the other party in reliance upon

10  that representation, changes his position to his detriment." (*Garcia v. World Savings, FSB* (2010)

11  183 Cal.App.4th 1031, 1041, fn. 10; *Panno, supra,* at p. 412)

12       Moreover, the issue of integration, i.e., whether the parties' intended writing is a final,

13  complete and exclusive statement of their agreement, is a question of fact.  (*Mobile Oil Corp. v.*

14  *Handley* (1978) 76 Cal.App.3d 956, 961)

15            **(3)**     **Chase's Refusal to Accept Payment on August 25 Constitutes an**

16                    **Anticipatory Repudiation**

17       On August 25, 2010 at 8:34 a.m., Mr. Slade told Mr. Badame that Chase would not

18  accept a payment because the Badame's modification request was denied and that he was

19  working with a 9:30 a.m. deadline in order to place the property in an auction to sell at a

20  Trustee's Sale scheduled for August 25, 2010. Mr. Slade's statement that Chase would not

21  accept a payment constitutes an anticipatory repudiation.

22       If one party notifies the other that he or she will not perform the contract and does not

23  retract the notice before the time for performance is due, the other party does not have to

24  perform.  (*Civil Code* §1440)  After one party to a contract has notified the other that he or she

25  will not, or cannot, perform, the burden is on him or her to show that before the time of

26  performance, he or she notified the other party of his or her willingness and ability to perform.

27  (*Hulen v. Stuart* (1923) 191 Cal. 562, 571.)

28

1        **(4)**    **The September 1, 2010 Loan Modification Was an Enforceable**

2                    **Agreement**

3        Chase claims that this letter does not constitute an enforceable agreement because the

4    sale had already occurred on August 25, 2010.

5        However, the undisputed facts are that Chase purchased the property at the auction sale

6    on August 25, 2010.  It, in fact, did not sell the property to a third party until October 2010.

7    Chase generated the letter on September 1, 2010 after it owned the property.  Accordingly, on

8    September 1, 2010, it was not "impossible" for Chase to perform under the contract.

9        The September 1, 2010 letter from Chase advised the Badames that the loan modification

10   had been denied because the net present value (NPV) was negative.  The Badames were further

11   advised that if Chase received a request from them within thirty days, it would provide them with

12   the date the NPV calculation was completed and the input values for the calculation.  If within

13   thirty days of receiving that information the Badames provided Chase with evidence that these

14   input values were incorrect and material, Chase would conduct a new NPV evaluation.

15       The September 1, 2010 letter further provided that no foreclosure would be conducted

16   and "you will not lose your home during the thirty day period."  The Badames believed that the

17   words of the letter were correct and sent Chase a response requesting the NPV calculations.

18       Chase misapplies the "meeting of the minds" concept.  "Mutual assent is determined

19   under an objective standard applied to the outward manifestation or discretion of the parties, i.e.,

20   the reasonable meaning of their words and acts and not their unexpressed intentions and

21   understandings." (*Alexander v. Code Masters Group, Ltd.* (2002) 104 Cal.App.4th 129, 141)

22   The manifestations of the parties are operative in accordance with the meaning attached to them

23   by one of the parties if that party has no reason to know of any different meaning attached by the

24   other, and the other has reason to know the meaning attached by the first party. [citation]  A

25   party may thus be bound by a negligent manifestation or assent if the other party is not equally

26   negligent. [citation] (*Merced County Sheriff's Employees Association v. County of Merced*

27   (1987) 188 Cal.App.3d 622, 673)

28       In any event, since "the existence of the contract is at issue" and the evidence is

1  "conflicting or admits of more than inference", it is for the trier of fact to determine whether the

2  contract actually existed. (*Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4[th] 199, 208)

3        **(5)**    **Chase's Breach of The Contract Has Caused The Badames Damage**

4        The measure of damages for breach of an obligation arising from contract is the amount

5  that will compensate the aggrieved party for all the detriment proximately caused by the breach,

6  or which, in the ordinary course of things, would be likely to result from the breach. (*Civil Code*

7  §3300)  The damages awarded should insofar as possible place the injured party in the same

8  position he would have held had the contract properly been performed. (*Brandon & Tibbs v.*

9  *George Kevorkian Accountancy Corp.* (1990) 226 Cal.App.3d 442, 463)  "The rules governing

10  the recovery of damages for breach of contract are very flexible.  Their application in the infinite

11  number of situations that arise is beyond question variable and uncertain.  Even more than in the

12  case of other rules of law, they must be regarded merely as guides to the court, leaving much to

13  the individual feeling of the court created by the special circumstances of the particular case."

14  (*Brandon & Tibbs, supra,* at p. 455)

15        Contractual damages are of two kinds—general damages and special damages.  General

16  damages are often characterized as those that flow directly and necessarily from the breach of

17  contract, or that are a natural result of a breach. (*Lewis Jorge Construction Management, Inc. v.*

18  *Pomona Unified School District* (2004) 34 Cal.4[th] 960, 968)  Special damages are those that are

19  peculiar to the contract or to the parties. (*Lewis Jorge Construction Management, Inc., supra,* at

20  p. 257)  The nature of the contract or the circumstances in which it is made may compel an

21  inference that defendant should have contemplated the fact that such a loss would be the

22  probable result of the defendant's breach. (*Burnett & Doty Development Co. v. Philips* (1978)

23  84 Cal.App.3d 384, 389-390 [Loss of anticipated profits recoverable when foreseeable and

24  reasonably certain]; *Christensen v. Slawter* (1959) 173 Cal.App.2d 325, 346.)

25        In this case, the Badames have stated that they have spent an amount close to $2,000,000

26  for construction costs for the property and have requested special damages for that amount in

27  their prayer to the second claim.

28        The Badames' damages, accordingly, are an issue of fact to be resolved by the jury.

**B.**     **The Sixth and Seventh Claim For Negligence And Negligent**
**Misrepresentation Involves Triable Issues of Material Fact as to The**
**Existence of a Duty of Care**

Chase argues that it does not owe borrowers such as the Badames a duty of care.  It relies on *Nymark v. Hart Federal Savings & Loan Association* (1991) 231 Cal.App.3d 1089, 1095-1096 for the proposition that, as a general rule, a financial institution owes no duty of care to a borrower.  *Nymark*, however, does not hold that a lender never owes a duty of care to a borrower.  On the contrary, the Court in *Nymark* based its determination on the six-factor test established in *Biakanja v. Irving* (1968) 49 Cal.2d 647, 650)

In *Nymark, supra,* the Court set the general rule that a financial institution owed no duty of care to a borrower in a loan transaction unless it exceeds "the scope of its conventional role as a mere lender of money."  To determine whether the institution exceeded the scope of its conventional role as a lender of money, Courts must balance the following factors:  (1) the extent to which the transaction was intended to affect the plaintiff, (2) the foreseeability of harm to him, (3) the degree of certainty that the plaintiff suffered injury, (4) the closeness of the connection between the defendant's conduct and the injury suffered, (5) the moral blame attached to the defendant's conduct, and (6) the policy of preventing future harm.  (*Nymark, supra, at p. 1098*)

In *Garcia v. Ocwen Loan Servicing, LLC* (N.D. Cal. 2010) 210 US Dist. Lexis 43575, the borrower plaintiff applied to the lender defendant for loan modification.  On at least two occasions prior to the sale of her house, the defendant had cancelled the trustee's sale to allow time for processing the plaintiff's application.  The defendant asked the plaintiff to submit various documents in connection with the loan modification request.  Plaintiff did so, but upon receiving the documents, the defendant routed them to the wrong department.  Later, the plaintiff's agent received a recorded message indicating documents were missing, but the message did not identify which ones were missing.  (*Garcia, supra*, at p. 3)  For the next several weeks, the plaintiff's agent repeatedly tried to contact the defendant to determine which documents were missing, but he was unable to speak with any of the defendant's employees.  The plaintiff's agent was finally able to actually speak with one of the defendant's employees,

but it was too late. The employee informed the plaintiff's agent that the home had been sold at a trustee's sale the day before.

The Court concluded that at least five of the six factors cited in *Nymark* weighed in favor of finding that the defendant owed the plaintiff a duty of care in processing the plaintiff's loan modification application.

The Court relied on the *Garcia* case in reaching a similar conclusion in *Chancellor v. One West Bank* (N.D. Cal. 2012) 212 U.S. Dist.Lexis 71992.  In *Chancellor*, the Court concluded that while the facts alleged were "not as egregious as those alleged in *Garcia*" (plaintiff's failure to receive a loan modification was virtually certain to result in the foreclosure of her home), she nevertheless alleged a duty of care under her negligence claim.

Here, the Second Amended Complaint demonstrates that under the *Nymark* factors, a duty of care was owed by Chase to the Badames: (1) The transaction was unquestionably intended to affect the Badames.  The decision on the Badames' loan modification application would determine whether or not the Badames could keep their home, (2) The potential harm to the Badames from mishandling the application processing was reasonably foreseeable:  The loss of an opportunity to keep their home was the inevitable outcome.  The mishandling of the loan modification application process deprived the Badames of the possibility of obtaining their requested relief, (3) The injury to the Badames was certain in that they lost the opportunity of obtaining a loan modification and of accumulating value through appreciation.  Their home was ultimately sold, and (4) There is a close connection between Chase's conduct and the injury actually suffered.

Whether or not moral blame attaches to Chase's specific conduct is not clear at this stage of the proceeding.  However, in light of the other facts weighing in favor of finding a duty of care, the uncertainty regarding this factor is insufficient to tip the balance away from the finding of a duty of care.  (See *Chancellor, supra,* at p. 12)

C.   **The Sixth Claim Satisfies The Requirements For Negligent Misrepresentation**

(1)   **Negligent Misrepresentation Is An Appropriate Claim**

1    The elements of a claim for negligent misrepresentation are a misrepresentation of fact,

2  lack of reasonable grounds, a duty to plaintiff, intent to induce reliance, reliance, causation and

3  harm.  (*National Union Life Insurance Co. of Pittsburgh, Penn. v. Cambridge Integrated*

4  *Services Group, Inc.* (2009) 171 Cal.App.4th 35, 50)

5    In *Richard Lueras v. BAC Home Loan Servicing, LP* (2013) 221 Cal.App.4th 49, 68-69,

6  the Court concluded the bank owed a duty to the borrower to not to make negligent

7  misrepresentations of fact.[2]

8    In *Lueras*, the borrowers alleged that a mere thirteen days before Bank of America

9  foreclosed on their home, Bank of America falsely represented in writing to them that no

10  foreclosure sale would occur while the borrower was being considered for "other foreclosure

11  avoidance programs."  In so doing, Bank of America expressly and in writing informed the

12  borrower he "will not lose [his] home during this review period."  A Bank of America

13  representative also informed the borrower that the pending foreclosure sale would be postponed.

14  Nevertheless, days later, Bank of America foreclosed on the lender's home. (*Lueras, supra,* at p.

15  55)  The trial court sustained the bank's First Amended Complaint without leave to amend.

16    The Court of Appeal concluded that a loan modification falls within the scope of a

17  lending institution's conventional role as a lender of money but that the bank has a separate duty

18  not to make negligent misrepresentations of fact.  (*Lueras, supra,* at p. 68)  As stated by the

19  Court:

20    "We conclude, however, that a lender does owe a duty to a borrower to not make
21    material misrepresentations about the status of an application for a loan
      modification or about the date, time or status of a foreclosure sale.  The law
22    imposes a duty not to make negligent misrepresentations of fact [citations].  … It
      is foreseeable that a borrower might be harmed by an inaccurate or untimely
23    communication about a foreclosure sale or about the status of a loan modification
      application, and the connection between the misrepresentation and the injury
24    suffered could be very close."(*Lueras, supra,* at pp. 68-69)

25

26    The First Amended Complaint in the *Lueras* case generally alleged Bank of America

27    [2] Chase previously relied heavily on *Aspiras v. Wells Fargo Bank, N.A.* (2013) 210
28  Cal.App.4th 949, which has been depublished by the Supreme Court on January 15, 2014
    (2014 Cal.Lexis 399)

MEMO OF Ps&As IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

1   failed to exercise "reasonable care and skill in timely and accurately responding to customer

2   requests and inquiries." (*Lueras, supra,* at p. 69)  Based upon the pleadings, the Court of Appeal

3   believed that *Lueras* could state a viable cause of action for negligent misrepresentation against

4   Bank of America and gave him leave to amend.

5          Here, the elements of negligent misrepresentation are satisfied by the following:

6          Because of the dramatic increase in their monthly incomes (the combined monthly

7   income was in excess of $42,000 per month), the Badames submitted a loan modification request

8   in May 2010.  In spite of the new request, Chase issued a Notice of Trustee's Sale on June 4,

9   2010 with a public auction scheduled for June 25, 2010.  Chase agreed to postpone the

10  foreclosure sale for sixty-(60) days to August 25, 2010 in exchange for the Badames sending two

11  monthly payments to them.  Chase, through its representative, Sherman Slade, represented to the

12  Badames that sixty days was more than sufficient to review the modification request. Chase,

13  however, did not assign the modification request to an underwriter until August 2, 2010, over a

14  month later.

15         Although Chase declined the modification request on August 13, Mr. Slade did not

16  inform the Badames until Mr. Badame called on August 24, the day before the foreclosure sale,

17  seeking an update.  When Mr. Slade reviewed the calculations with Mr. Badame, Mr. Badame

18  advised Mr. Slade that Chase had improperly excluded income and improperly included some

19  expenses, the combined effect of which was in excess of $7,200 per month.

20         After placing Mr. Badame's call on hold to consult with an underwriter, Mr. Slade

21  acknowledged that those inputs would make a substantial difference and agreed that the August

22  25 foreclosure sale could be extended to September 9 if the Badames signed a Postponement

23  Agreement, sent to Chase a Listing Agreement for the Marjorie property which they planned to

24  sell when the modification request was approved, and sent Chase one month's additional

25  payment.  Mr. Slade agreed with Mr. Badame that since the Badames could not get to their bank

26  and obtain a cashier's check on August 24, they would get to their bank at 9:00 a.m. on August

27  25 and purchase a cashier's check, evidence of which would be immediately E-mailed to Mr.

28  Slade.

1    In spite of this agreement by Mr. Slade and the reliance upon the agreement by the

2    Badames, Mr. Slade told Mr. Badame in the early morning on August 25 that the modification

3    request was again declined because of insufficient income and the foreclosure sale was going to

4    go through.

5    In short, the foreclosure sale took place before Chase corrected the improper income and

6    expense calculations on the modification request and before it properly and completely re-

7    evaluated the modification request.

8        **(2)**    *Federal Rule* **9(b) Does Not Apply to The Negligent Misrepresentation**

9        **Claim.  However, Even if it Did, Plaintiffs' Complied With The Rule.**

10   The Ninth Circuit has not yet decided whether Rule 9(b)'s heightened pleading standard

11   applies to a claim for negligent misrepresentation.  In *Peterson v. Allstate Indemnity Company*

12   (2012) 281 FRD 413, 415 et seq., Judge Carter concluded that Rule 9(b) does not apply to

13   negligent misrepresentation claims and criticized the holding of *Nielsen v. Union Bank of*

14   *California* (CD Cal. 2003) 290 F.Supp. 1001, 1141 (*Peterson* at p. 416; see also, *U.S. Capital*

15   *Partners, LLC v. AHMSA International, Inc.* (ND Cal. 2013) 2013 U.S. Dist.Lexis 20245;

16   *Patrick D. Howard v. First Horizon Home Loan Corporation* (ND Cal. 2013) 2013

17   U.S.Dist.Lexis 167715 [The court in accordance with the *Peterson* case concludes that Rule 9(b)

18   does not support applying the rule to a claim for negligent misrepresentation because it is

19   expressly limited to allegations of fraud or mistake])

20   Alternatively, the Badames contend that the negligent misrepresentation claim meets the

21   Rule 9(b) standard.  (*Peterson, supra*, at p. 419 ["The Court concludes that the Complaint

22   adequately pleads the 'circumstances' required by Rule 9(b), that is, the 'who, what, when,

23   where, and how' of the fraudulent activity and the 'what is false or misleading about a statement,

24   and why it is false." (See, *Vess v. Ciba-Geigy Corp. USA* (9th Cir. 2003) 317 F.3d 1097, 1106)

25   **D.**    **There Is a Triable Issue of Fact Concerning The Resulting Tort Damages**

26   It is a long-established rule that tortious damages are awarded to fully compensate the

27   victim for all injuries suffered.  There is no fixed rule for the measure of tort damages under

28   *Civil Code* §3333.  "The measure that most appropriately compensates the injured party for the

loss sustained should be adopted." (*Strebel v. Brenlar investments, Inc.* (2006) 135 Cal.App.4[th] 740, 749; *Metz v. Soares* (2006) 142 Cal.App.4[th] 1250, 1255; *Santa Barbara Pistachio v. Cowchila Water District* (2001) 88 Cal.App.4th 439, 446-447)  Under *Civil Code* §3333, a Court has discretion and flexibility to instruct a jury on an award that will appropriately compensate the plaintiff for the detriment caused by the defendant's tortious conduct. (*Metz, supra*, at p. 1255; *Strebel, supra*, at p. 749)  Sometimes neither the out-of-pocket nor benefit of the bargain measure of damages is particularly helpful or appropriate.

In *Strebel, supra*, a homeowner sought fraud damages from a real estate broker who induced him to sell his existing home and to enter into a contract to buy a new home in Sonoma County without disclosing that the new home was unsalable due to tax liens. "Strebel asserted that he was injured because defendant's fraud caused him to sell his San Bruno home sooner than he would otherwise have done, rendering him unable to purchase a replacement home before housing values substantially increased. … The resultant home was a decrease in the buying power of the proceeds of his San Bruno hone in a rapidly appreciating housing market." (*Strebel*, at p. 749-750)

Strebel claimed economic damages including the lost appreciation of the San Bruno house between its sale in 1999 and trial in 2003 and the lost use of the property during that period.

Strebel's expert calculated the gross lost appreciation by subtracting the 1999 sale price from his opinion of the then current fair market value of the house based on a study of comparable sales. This produced an increase in value of 46 percent, which he considered to be conservative when compared to a 62 percent rate of appreciation between 1999 and 2003.  He then reduced the gross amount by the estimated closing costs on such a sale to reach net lost appreciation. (*Strebel* at p. 745)

The plaintiffs' expert calculated his loss of use damages by subtracting the costs associated with living in the plaintiff's house, mortgage interest, taxes and insurance, from the cost of renting a similar house in San Bruno.

**MEMO OF Ps&As IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

1    The jury awarded lost appreciation damages and the award was confirmed by the Court

2    of Appeal.  The Court upheld the award based on the value of the San Bruno home at the time of

3    trial, rather than at the time of the sale of the property, which Strebel had been fraudulently

4    induced to sell because "measuring Strebel's damages at the time of the sale would provide no

5    compensation for the most significant portion of the loss he suffered as a result of defendant's

6    fraud." (*Strebel* at p. 750)  The Court in *Strebel* also affirmed loss of use damages measured by

7    the "loss of the use of the San Bruno home between the sale and the time of trial," which was

8    measured by subtracting Strebel's costs of living in the San Bruno home from the market value

9    for a similar home.  (*Strebel* at p. 754)

10    The Court of Appeal in *Strebel* reiterated the principle that California Courts have upheld

11    an award of damages based on the value at the time of trial, rather than the time of sale of

12    property, which the seller had been fraudulently induced to sell.  (*Estate of Anderson* (1983) 149

13    Cal.App.3d 336, 354)  The Court concluded that "California law is not as restrictive as the bank

14    urges, and [found] that the award in this case does not offend against reasonableness or any other

15    policy of recovery.  Thus, what constitutes making "good" the loss may vary according to the

16    circumstances (*Estate of Anderson, supra*, at p. 355; *Garrett v. Perry* (1959) 53 Cal.App.2d 178,

17    185 ["The statements … that damages are to be assessed as of the date of the fraudulent

18    transaction is too broad insofar as it means that the Court cannot consider subsequent factors

19    which affect the amount of the actual loss."])  Here, as in *Strebel*, Plaintiffs entered into the

20    transaction with the intent to ultimately sell their home.

21    Chase will undoubtedly contend that the principle of the *Strebel* case is limited to matters

22    involving fiduciary duties.  It is not.

23    In the unpublished case of *Isaac Martin v. Yar Harpas* (2009 Cal.App.Unpub.Lexis

24    6875) plaintiff sued defendant for fraud, broker and lender misconduct, violation of the

25    consumer Legal Remedies Act, intentional infliction of emotional distress and interference with

26    prospective economic advantage.  The claim arose out of the defendant's failure to fully fund a

27    home of $175,000.  Without the funds, plaintiffs were unable to complete construction of their

28    home and lost the home through foreclosure, which loss the Court found was caused by

1    defendant's wrongful conduct. As compensatory damages, the Court awarded plaintiffs the

2    amount of equity they lost in the home and non-economic damages.

3         The Court of Appeal concluded that the trial court properly permitted plaintiffs to recover

4    damages for the loss of equity in their home "based on the value at the time of trial because it is a

5    reasonable measure of harm they suffered as a consequence of defendant's fraud." The trial

6    court expressly found that plaintiffs "could have been able to keep the house if defendants had

7    not engaged in fraud", and that they would have completed [construction on] the property but for

8    defendant's fraud in lending the money." Accordingly, the trial court properly permitted

9    plaintiff to recover damages for loss of equity.

10        The Badames' expert appraiser will testify that the value of the property at the time of

11   trial will be well in excess of $1,000,000 more than they owed Chase.

12   **E.    The Economic Loss Doctrine Does Not Bar The Badames' Tort Claims**

13        Chase drastically overstates applicability of the economic loss rule. In *Robertson*

14   *Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 990, the California Supreme Court

15   synthesized the relevant test for allowing a contract-based claim to be pursued as a tort cause of

16   action: "Generally, outside the insurance context, a tortious breach of contract … may be found

17   when (1) the breach is accompanied by a traditional common law tort such as fraud or

18   conversion; (2) the means used to breach the contract are tortious, involving deceit or undue

19   coercion; or (3) one party intentionally breaches the contract intending or knowing that such a

20   breach will cause severe unmitigable harm, in the form of mental anguish, personal hardship or

21   substantial consequential damages."

22        The *Robertson* court approved its prior holding in *Erlich v. Menezes* (1999) 71 Cal.4th

23   543, 553-554 that "conduct amounting to a breach of contract becomes tortious only when it also

24   violates a duty independent of the contract arising from principles of tort law." including

25   instances in which the contract was fraudulently induced. (*Robertson, supra*, at pp. 989-990;

26   *Oracle USA, Inc. v. EXCEL Global Services, Inc.* (N.D. Cal. 2009) 2009 U.S. Dist. Lexis 59999,

27   p. 4 [Exceptions to the economic loss rule permitted where contract was fraudulently induced];

28   *County of Santa Clara v. Atlantic Richfield Co.* (2006) 137 Cal.App.4th 292, 328-329 [Economic

loss rule does not apply where a tort claim arises independently of contract claims and with respect to "any intentional affirmative fraud action where the plaintiff can establish that the fraud exposed the plaintiff to liability.])

**F.    Plaintiffs' Fraud Claim is Not Barred by The Economic Loss Doctrine**

The Badames contend that the Postponement Agreement was fraudulently induced and that Chase delayed informing the Badames of the declination based on incorrect information until the day before the foreclosure sale was to occur and then refused, as agreed, to continue the foreclosure to provide its Underwriting Department with sufficient time to correctly review the application.

**G.    Plaintiffs' Wrongful Foreclosure Claim is Not Barred by The Economic Loss Rule**

A lender may be liable for wrongful foreclosure if the property was fraudulently or illegally sold under a power of sale contained in a mortgage or deed of trust.  (*Rosenfeld v. JP Morgan Chase Bank, N.A.* (N.D. Cal. 2010) 732 F.Supp.2d 952, 961)

Here, the property was fraudulently sold.

**H.    The Fifth Claim Properly States a Claim For Fraud**

The tort of fraud requires a misrepresentation, knowledge of falsity, intent to induce reliance, reliance, causation and resulting damages.  (*Robinson Helicopter, supra*, at p. 990; *Lazar v. Superior Court* (1996) 12 Cal.4th 631, 638)

A false representation is a suggestion, as a fact, of something untrue by one who does not believe it to be true.  (*Civil Code* §1710(1))  In general, the statement must be of a past or present fact.  (*Civil Code* §1710(1); *Appolo Capital Fund, LLC v. Roth Capital Partners, LLC* (2007) 158 Cal.App.4th 226, 241 [Assertion that stock offering was "done deal" and certain features "guaranteed" were statements of fact.])

The misrepresentation may be conveyed by conduct (*Thrifty-Telephone, Inc. v. Bezenek* (1996) 46 Cal.App.4th 1559, 1567) and may be communicated indirectly (*Mega Life & Health Insurance Co. v. Superior Court* (2009) 172 Cal.App.4th 1522, 1530)

In addition, suppression of a fact by one who is bound to disclose it (*Civil Code*

1    §1710(3)) often referred to as concealment (*Lovejoy v. AT&T Corp.* (2004) 119 Cal.App.4[th] 151,

2    158) may constitute fraud.

3          Here, the Badames have satisfied the fraud standard by the evidence of material

4    misrepresentations and suppression of facts.  Chase's contention that this fraud claim is

5    contradicted by other evidence supports the Badames' contention that this is a material triable

6    issue of fact.

7    **4.    CHASE CONCEDES THAT THE PROMISSORY ESTOPPEL CLAIM IS NOT**

8          **NEEDED BECAUSE THE PROMISE WAS SUPPORTED BY CONSIDERATION**

9          Promissory estoppel claims are aimed solely at allowing the recovery in equity where a

10   contractual claim fails for lack of consideration, "and in all other respects the claim is akin to one

11   of breach of contract. …"  (*U.S. Ecology, Inc. v. State of California* (2005) 129 Cal.App.4[th] 887,

12   904)  The promissory estoppel claim was an alternative pleading.

13         Chase concedes in its moving papers that the promise was supported by consideration:

14   "The Postponement Agreement constituted an enforceable contract and neither Chase nor

15   Plaintiffs contend that consideration in support of the agreement was inadequate.  (Defendant's

16   Memorandum of Points and Authorities in Support of Motion for Summary Judgment, p. 23,

17   lines 25-27)

18   **5.    UNFAIR BUSINESS PRACTICES PURSUANT TO *BUSINESS AND***

19         ***PROFESSIONS CODE* §17200**

20         **A.    *Business and Professions Code* Violations**

21         The Unfair Competition Law ("UCL") is codified in *Business and Professions Code*

22   §17200, et seq.  The UCL prohibits any "unlawful, unfair or fraudulent business act or practice."

23   (§17200)  "Because *Business and Professions Code* §17200 is written in the disjunctive, it

24   establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair,

25   or fraudulent."  (*Podolsky v. First Healthcare Corp.* (1996) 50 Cal.App.4[th] 632, 647)  An act can

26   be alleged to violate any or all of the three prongs of the UCL – unlawful, unfair, or fraudulent.

27         The UCL borrows violations of other laws … and makes those unlawful practices

28   actionable under the UCL.  (See *Lazar v. Hertz Corp.* (1999) 69 Cal.App.4[th] 1494, 1505)  Thus,

1  a violation of another law is a predicate for stating a cause of action under the UCL's unlawful

2  prong.

3  **B.    Unfair Business Practice**

4      The "unfair" prong of §17200 intentionally provides Courts with broad discretion to

5  prohibit new schemes to defraud.  (*Motas, Inc. v. Times Mirror Co.* (1980) 102 Cal.App.3d 735,

6  740)  An unfair business practice occurs when that practice offends an established public policy

7  or when the practice is immoral, unethical, oppressive, unscrupulous, or substantially injurious to

8  consumers.  (*Smith v. State Farm Mutual Automobile Insurance Co.* (2001) 93 Cal.App.4[th] 700,

9  719; *Gibson v. World Savings & Loan Association* (2002) 103 Cal.App.4[th] 1291, 1306-1307 [A

10  lender's failure to comply with Trust Deed provisions was an unfair business practice.])

11      Here, Chase's conduct was an unfair business practice.  Even though the California

12  Legislature did not make dual tracking illegal until January 1, 2018 (*Civil Code* §2923.6(c)),

13  Courts still found it "unfair" well before the effective date of the act for purposes of §17200.

14  (*Jolley v. Chase Home Finance, LLC* (2013) 213 Cal.App.4[th] 872, 907; *Flint W. Murfitt v. Bank*

15  *of America* (CD Cal. 2013) 213 U.S. Dist. Lexis 163345)

16  **C.    Members of The Public Are Likely to be Deceived**

17      Chase contends that the Badames have not demonstrated that members of the public are

18  likely to be deceived by Chase's fraudulent and misleading conduct.  It is clear, however, that

19  this is an issue of a disputed fact rather than an issue of law.  (*Tucker v. Pacific Bell Mobile*

20  *Services* (2012) 208 Cal.App.4[th] 201, 230 [Whether at least some members of the public were

21  likely to be deceived were not issues that could be resolved as a mater of law on demurrer.])

22  **D.    Damages**

23      In *Lueras, supra,* the Court granted leave to the lender to amend his Complaint in order to

24  satisfy the "caused by" prong of the §17204 standing requirement, i.e., show "plaintiff's

25  economic injury occurred as a result of the unfair competition."  The Court of Appeal stated:

26      "As we explained in addressing the fraud cause of action, Bank of America
        informed Lueras any pending foreclosure sale would be 'on hold' while he was
27      being considered for other foreclosure avoidance programs.  Whitaker of Bank of
        America told him the May 5, 2011 letter was sent in error and he had been
28

approved for loan modification.  Lueras was told the foreclosure sale was to be rescheduled pending Fannie Mae's approval of his loan modification. Those allegations suggest Lueras can amend his UCL cause of action to allege Bank of America's misrepresentations caused him to lose his home through foreclosure. In addition, Lueras might be able to allege Bank of America did not work with him in good faith to evaluate and try to identify and implement a permanent solution, as a consequence of which he lost his home through foreclosure." (*Lueras, supra*, at pp. 63-64)

Here, the allegations of the Badames are virtually identical.  *Business and Professions Code* §17203 expressly authorizes the Court to take whatever action is necessary to restore to any person an interest in any property acquired by means of unfair competition.  The broad range of remedies includes restitution and disgorgement of profits.  (*Blanco Wine Co. v. Frank A. Logoluso Farms* (1989) 214 Cal.App.3d 699, 704)  The proper measure of restitution is the amount received by the defendant as a result of the improper conduct, even if the amount of monetary damage suffered by the plaintiff as a consequence of the conduct is greater.  (*Inline, Inc. v. Apace Moving Systems, Inc.* (2005) 125 Cal.App.4[th] 895, 903-904)

The Badames are also entitled to injunctive relief under §17203.

## 6.  CONCLUSION

For the reasons set forth above, it is respectfully requested that Chase's Motion be denied.

DATED: January 27, 2014.                    GREBOW & RUBIN, LLP


BY: _____
                                      ARTHUR GREBOW
                                      Attorneys for Plaintiffs JAMES A.
                                      BADAME and DIANE M. BADAME

MEMO OF Ps&As IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**AFFIDAVIT AND DECLARATION OF PROOF OF SERVICE**

I am over the age of eighteen years and not a party to the within action.  I am employed by GREBOW & RUBIN, LLP, 16133 Ventura Boulevard, Suite 260, Encino, California  91436 ("the firm").

On January 27, 2014, I served the within document(s) described as:  **MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT** on the interested parties in this action:

☒     by placing ☐ the original ☒ true copy(ies) thereof enclosed in sealed envelope(s)
       ☒ addressed as follows: ☐  addressed as stated on the attached mailing list.

Terry Ross, Esq.
David D. Piper, Esq.
Brian M. Bohn, Esq.
Keesal, Young & Logan
A Professional Corporation
400 Oceangate
Post office Box 1730
Long Beach, California  90801-1730
Facsimile:  (562) 436-7416

☒     **CM/ECF**:  The document was electronically served on the parties to this action via the mandatory United States District Court of California CM/ECF system upon electronic filing of the above-described document.

☒     (Federal) I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct.

Executed on January 27 2014, at Encino, California.

SHELLEY E. ARLEN

57279 20140124 Badame-Oppo-Ps&As-1.docx

**MEMO OF Ps&As IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

26